**Opinion issued March 12, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00525-CV

———————————

**JAMES J. FLANAGAN SHIPPING CORPORATION, Appellant**

**V.**

**DEL MONTE FRESH PRODUCE N.A., INC., Appellee**

---

**On Appeal from the County Court at Law No. 3**
**Galveston County, Texas**
**Trial Court Case No. CV0060347**

---

## OPINION ON REHEARING

Appellant Del Monte Fresh Produce N.A., Inc. has filed a motion for rehearing of our December 6, 2012 opinion. We grant the motion, withdraw our opinion and judgment of December 6, 2012, and issue this opinion in its stead.

James J. Flanagan Shipping Corporation appeals the trial court's rendition of a take nothing judgment on its claims against Del Monte. Flanagan sued Del Monte and other defendants for breach of fiduciary duty, knowing participation in a breach of fiduciary duty, conspiracy, conversion, unjust enrichment, unfair competition, and accessing proprietary and confidential business information. After settling with the other defendants, Flanagan tried its claims against Del Monte to the bench. The trial court concluded Flanagan's claims were "well founded" and its findings were favorable to Flanagan. But, after concluding that the economic loss rule and a settlement credit applied to bar Flanagan's recovery, the trial court rendered a take nothing judgment on all of Flanagan's claims against Del Monte. On appeal, Flanagan contends the trial court erred by applying the economic loss rule and by finding that its award of exemplary damages should be reduced based on a settlement credit. We reverse and render judgment for Flanagan.

## Background

Flanagan operates a stevedoring facility in Galveston, Texas. Del Monte imports fresh produce, with ships arriving in Galveston throughout the year. In 1997, Flanagan began providing stevedoring services for Del Monte in Galveston. Between 1997 and 2007, Del Monte sent out requests for proposals, seeking bids from companies to provide stevedoring services. Flanagan was chosen each time.

2

In 2006, Del Monte hired a new manager for its Galveston operations, Joe Wiley. Wiley, the self-described "new sheriff in town," conducted a review of the Galveston operations and concluded that Flanagan was not performing adequately. He recommended against renewing Flanagan's contract when the current contract expired at the end of September 2007. In the spring of 2007, Del Monte sent out requests for proposals for taking over the stevedore operations in Galveston. Flanagan submitted a proposal, and Tom Flanagan, Flanagan's president and CEO, sent Del Monte's Vice President of Port Operations, Tim Albano, a letter committing to improve Flanagan's services if the contract was awarded to Flanagan. Specifically, he promised Flanagan would have all new equipment by the time Del Monte completed the planned refurbishing and improvements of its Galveston facilities.

After receiving proposals from Flanagan and other companies, Wiley recommended awarding the new Del Monte contract to his former employer, Logistec. Albano concurred, but neither Wiley nor Albano had the authority to make that decision. Only Del Monte's Vice President of Shipping Operations, Helmut Lutty, did. Lutty decided to award the contract to Flanagan. He testified that one reason he did so was because both he and Wiley were new in their positions, so he did not want to make a change in the Galveston operations. He also testified that, in deciding to award contracts, he considered cost to be the

driving factor, and Flanagan's bid was better than Logistec's. Flanagan and Del Monte thus agreed to a contract for a term of one year, to automatically renew for two additional years if neither party timely provided notice to terminate.

Wiley testified that by the end of November 2007, the first portion of Del Monte's facility upgrade was complete. Room 4, a refurbished and improved refrigerated warehouse, was put into use around Thanksgiving. Wiley testified that Flanagan did not have the promised new forklifts to take advantage of the improvements in Room 4. Wiley complained that no new forklifts were available and asked Louis Rippol, Flanagan's clerk in charge, when the new forklifts would arrive. Rippol told Wiley that Flanagan had never ordered the forklifts. Wiley felt that Mr. Flanagan had lied to him and became "furious." He told Rippol that Flanagan was done with Del Monte. According to Wiley, this conversation took place around early December.

Around this same time, Richard Bradford, who was Flanagan's manager in Galveston, began talking to Del Monte about Del Monte replacing Flanagan with Bradford's former employer, Pacific Stevedoring. Wiley and Bradford testified that a few days after Wiley had decided Flanagan was done with Del Monte, Bradford asked if Wiley would consider a bid from Pacific. While Wiley testified that this happened around December 27, phone records show that Bradford called Pacific on December 3, and a December 14 email shows Bradford detailed for

4

Pacific what would be required for Pacific to provide stevedoring services for Del Monte in Galveston. Phone records also show that Bradford called Pacific again on December 26 and, shortly after that call, placed a ten-minute call to Albano's direct line in Florida. Albano denied having any conversation with Bradford about Pacific taking over Flanagan's contract.

Bradford began providing Pacific with Flanagan's proprietary information, including information about Flanagan's business model and price structure, to enable Pacific to submit the winning bid for the Del Monte contract. Many of the emails from Bradford to Pacific were from his personal email account, not his Flanagan account. In one email to Pacific, Bradford wrote, "You should know that getting all the numbers you need is very difficult without creating suspicion." At trial, Bradford unequivocally testified that Wiley knew Bradford was sending information to Pacific and, in fact, it was Wiley who had told Bradford not to create any suspicion.

Wiley and Albano told Bradford that opportunities with Pacific would be available to Bradford if Pacific replaced Flanagan as Del Monte's stevedoring company. Pacific formed a new company, Gulf Stevedoring Services, LLC. In February 2008, Gulf submitted a bid offering the exact pricing and services as Flanagan's bid and indicated that Bradford would be Gulf's operations manager. Wiley testified that he was "very surprised and shocked" that the rates were

5

identical and no changes had been made to the bid. Wiley therefore worked with Bradford to make minor changes to the Gulf bid.

In May 2008, Wiley and Albano recommended to Lutty that Del Monte accept Gulf's bid and terminate Flanagan's contract. Lutty agreed and signed a contract with Pacific to begin on October 1, 2008. Despite Lutty having made a final decision, Albano sent Mr. Flanagan an email falsely stating that Flanagan's contract "was under review." Wiley was instructed not to tell Flanagan the contract would not continue beyond the initial one-year term. In August, approximately six weeks before the end of the contract's term, Del Monte gave notice of termination of the contract to Flanagan and replaced Flanagan with Gulf.

Flanagan sued Del Monte and other defendants, including Bradford, Pacific, and Gulf. All defendants other than Del Monte settled with Flanagan for $1,500,000, and Flanagan tried its claims against Del Monte to the bench. After the trial, the trial court set forth in its judgment a lengthy narrative describing the events leading up to the lawsuit. The trial court identified conflicting evidence and explained that the conflicting evidence presented by Del Monte was not credible. The trial court concluded Bradford had committed a breach of fiduciary duty and that Del Monte was a joint tortfeasor because it encouraged Bradford knowing that Bradford was breaching his fiduciary duties to Flanagan. The trial court also concluded that Del Monte engaged in unfair competition and that Del Monte had

6

conspired with the other defendants to harm Flanagan. The trial court found that Flanagan suffered lost profits in the amount of $1,348,910 and that exemplary damages in the amount of $635,928 were justified.

Although the trial court described Flanagan's causes of action as "well founded," two legal conclusions led it to enter a take nothing judgment. First, it concluded that the $1,500,000 settlement credit should be applied against both actual and exemplary damages, reducing Flanagan's potential recovery from $1,984,838 to $484,838. Second, it concluded the economic loss rule applied to bar any recovery whatsoever. Flanagan appealed and contends the trial court erred in applying the economic loss rule and settlement credit to bar Flanagan's recovery.

## Findings of Fact Recited in the Judgment

Before turning to the trial court's application of the economic loss rule and settlement credit, we address a threshold issue in dispute: whether the trial court's findings of fact should be accorded probative value, given that they are recited in the judgment. Del Monte contends we should affirm the judgment because the trial court's placement of its findings of fact in the judgment—as opposed to a separate document—violates Texas Rule of Civil Procedure 299a and renders the findings null. Therefore, Del Monte argues, we must ignore the trial court's findings and apply the well-settled rule that, in the absence of findings, all findings

7

in favor of the take-nothing judgment are implied. Flanagan responds that the findings are valid because they do not conflict with any other findings in the record.

> Texas Rule of Civil Procedure 299a provides:

> Findings of fact shall not be recited in a judgment. If there is a conflict between findings of fact recited in a judgment in violation of this rule and findings of fact made pursuant to Rules 297 and 298, the latter findings will control for appellate purposes. Findings of fact shall be filed with the clerk of the court as a document or documents separate and apart from the judgment.

TEX. R. CIV. P. 299a. The trial court erred by reciting its findings of fact in the judgment. However, the record contains no other findings of fact. Therefore, there is nothing with which the trial court's findings could conflict. Accordingly, the trial court's findings are accorded probative value. *See Gonzalez v. Razi*, 338 S.W.3d 167, 175 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (quoting *In re Sigmar*, 270 S.W.3d 289, 295 n.2 (Tex. App.—Waco 2008, orig. proceeding) ("[F]indings of fact recited in an order or judgment will be accorded probative value so long as they are not in conflict with findings recited in a separate document.")); *In re C.A.B.*, 289 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("[t]he mere inclusion of findings in a judgment does not mean the findings have no effect" and "findings improperly included in a judgment still have probative value and are valid as findings"); *Hill v. Hill*, 971 S.W.2d 153, 157 (Tex. App.—Amarillo 1998, no pet.) (recognizing that "findings contained in a

8

judgment (contrary to Rule 299a) are not shorn of all authority" but "*only to the extent they conflict*" with findings made in a separate document (emphasis in original)).

Relying on *Frommer v. Frommer*, 981 S.W.2d 811 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd), Del Monte argues we should ignore the findings altogether. In *Frommer*, a divorce case, a jury determined that the husband had not committed a fraud on the community estate. 981 S.W.2d at 812. However, the final judgment awarded the wife a sum of money and stated the reason for the award was the husband's fraud. *Id.* at 812–13. Neither party requested findings of fact. On appeal, the husband contended that the trial court's "finding" in the judgment supporting the additional award to the wife conflicted with the jury finding that he had not committed fraud. *Id.* at 812–13. This court concluded that the findings contained in the judgment could not be used to support a claim on appeal. *Id.* at 813–14.

We find *Frommer* distinguishable. The basis of the appeal in *Frommer* was that the trial court's finding arguably conflicted with a prior jury finding. *Frommer*, 981 S.W.2d at 812–13. Here, there are no findings other than the ones the trial court set forth in the judgment. There is no possible conflict, and Del Monte does not contend otherwise.

9

## Economic Loss Rule

In its first issue, Flanagan contends that the trial court erred by concluding the economic loss rule applied to bar recovery. Citing *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex. 1986), Del Monte argues the economic loss rule does apply because the damages Flanagan sought were exactly what it would have earned under the contract had it not been terminated. We review this issue of law de novo. *Miranda v. Byles*, No. 01-10-01022-CV, 2012 WL 5285666, at *7 (Tex. App.—Houston [1st Dist.] Oct. 25, 2012, pet. filed) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)).

Although the Texas Supreme Court described the term as "something of a misnomer," one general formulation of the economic loss rule, as applicable to this case, is that a party may not recover in tort for purely economic losses suffered to the subject matter of a contract. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415, 418 (Tex. 2011). In determining whether the economic loss rule applies, courts must consider "both the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex. 1998) (quoting *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 12 (Tex. 1996)).

Del Monte asserts that the Supreme Court's opinion in *Jim Walter Homes* bars Flanagan's recovery in this case. The claim in *Jim Walter Homes* was that the builder of a home had "breached the warranty of good workmanship and . . . was grossly negligent in the supervision of the construction of the house." 711 S.W.2d at 617. The Supreme Court noted that the plaintiffs' sole injury "was that the house they were promised and paid for was not the house they received" and that that claim could "only be characterized as a breach of contract." *Id.* at 618.

More recently, the Texas Supreme Court explained that the economic loss rule has been applied more narrowly than Del Monte argues. In *Sharyland Water Supply Corporation*, the Supreme Court said "[W]e have applied the economic loss rule only in cases involving defective products or failure to perform a contract." 354 S.W.3d at 418. The Supreme Court also explained that the fact that a party seeks economic damages does not necessarily bar a tort cause of action. *Id.* at 418–19 (noting that economic losses may be recovered in tort for "negligent misrepresentation, legal or accounting malpractice, *breach of fiduciary duty*, fraud, fraudulent inducement, tortious interference with contract, nuisance, wrongful death claims related to loss of support from the decedent, business disparagement, and some statutory causes of action" (emphasis added) (footnotes omitted)).

Here, Flanagan does not assert that Del Monte caused Flanagan's damages by performing its duties under the contract in a negligent or grossly negligent

11

manner. *Cf. Jim Walter Homes, Inc.*, 711 S.W.2d at 617 (holding economic loss rule applied where plaintiff attempted to cast breach of contract claim as tort claim). Del Monte's duty under the contract was, essentially, to pay Flanagan for stevedoring services. Flanagan does not complain about any failure on the part of Del Monte to perform this contractual obligation. Rather Flanagan's claim is based on Del Monte's involvement in Bradford's breach of fiduciary duty. In other words, Flanagan seeks to recover the lost profits it would have earned under the contract if Del Monte had not encouraged and participated in Bradford's disclosure of Flanagan's business model and pricing structure to a competing company, causing Del Monte to terminate the contract with Flanagan after the initial one-year term. The duty breached in this case—the fiduciary duty owed by an agent, Bradford, to his principal, Flanagan—did not arise from the contract. Rather, as Flanagan notes in its brief, the duty breached existed independent of Flanagan's contract with Del Monte. Accordingly, the economic loss rule does not apply. *See Formosa Plastics*, 960 S.W.2d at 47 (holding that "tort damages are recoverable for a fraudulent inducement claim irrespective of . . . whether the plaintiff only suffers an economic loss related to the subject matter of the contract"); *see also Sharyland Water Supply Corp.*, 354 S.W.3d at 418 (noting economic losses are recoverable for breach of fiduciary duty). We therefore

12

conclude that *Jim Walter Homes* and the economic loss rule do not apply to this case.

## Settlement Credit

In its second issue, Flanagan contends the trial court erred by applying a settlement credit against the exemplary damages award. Del Monte does not disagree.

Chapter 33 of the Texas Civil Practice and Remedies Code provides for a credit in the case of a settling defendant. TEX. CIV. PRAC. & REM. CODE ANN. § 33.012(b) (West 2008) ("If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements."). However, Chapter 33 expressly states that it "does not apply to . . . a claim for exemplary damages included in an action to which this chapter otherwise applies . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 33.002(c)(2) (West 2008). We therefore conclude that the trial court erred by applying a settlement credit to the exemplary damages assessed against Del Monte. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 391 (Tex. 2000) (non-settling defendant may only claim credit based on damages for which all joint tortfeasors jointly liable); *Gilcrease v. Garlock, Inc.*, 211 S.W.3d 448, 457 (Tex. App.—El Paso 2006, no

13

pet.) (exemplary damages assessed against non-settling defendant may not be offset by amount of common damages paid by settling defendants).

## Causation

Del Monte contends the judgment should be affirmed because there is no evidence of causation. Specifically, Del Monte contends the evidence shows Del Monte had decided to replace Flanagan in December 2007 and, because all of Bradford's alleged wrongdoing occurred after that decision had been made, the wrongdoing did not cause Flanagan's loss.

Evidence is legally insufficient when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or rules of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In determining whether there is legally sufficient evidence, we must consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *Id.* at 807, 827. "If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then [the fact-finder] must be allowed to do so." *Id.* at 822; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "A reviewing court cannot substitute

14

its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller*, 168 S.W.3d at 822. When, as here, a party who does not have the burden of proof at trial challenges the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *City of Houston v. Hildebrandt*, 265 S.W.3d 22, 27 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (citing *Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998)). Additionally, we may "not invade the fact-finding role of the trial court, who alone determines the credibility of the witnesses, the weight to give their testimony, and whether to accept or reject all or any part of that testimony." *Volume Millwork, Inc. v. W. Hous. Airport Corp.,* 218 S.W.3d 722, 730 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

Del Monte contends that "uncontradicted" evidence shows that Del Monte decided not to continue its contractual relationship with Flanagan in December 2007, before Bradford began feeding Flanagan's information to Pacific. Wiley testified that he made the decision to replace Flanagan in December 2007. He also testified that Albano agreed with him. Albano's testimony was consistent with this, and Albano added that Lutty also agreed in December 2007 to terminate the relationship with Flanagan.

15

But there is also evidence from which a rational fact-finder could conclude that Lutty, the only person with the authority to make the decision on behalf of Del Monte, did not decide to terminate Flanagan's contract until May 2008, well after Bradford and Del Monte conspired to help Gulf win the contract. Both Wiley and Albano testified that neither of them had the authority to decide who would receive the contract, only Lutty did. Lutty himself never testified about when he made the decision, and Wiley testified that he did not know what Lutty's decision was until May of 2008. A reasonable fact-finder could conclude that, although Wiley and Albano testified they had made a decision to terminate Flanagan as of December 2007, Lutty's decision was not made until May 2008, after—and because—Bradford's and Del Monte's misconduct allowed Gulf to match Flanagan's bid. *See Hildebrandt*, 265 S.W.3d at 27.

### Malice

Del Monte also contends no evidence supports a finding of malice, which is required to support an award of exemplary damages against Del Monte. Exemplary damages may be awarded only when there is clear and convincing evidence of fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003 (West Supp. 2012). In this case, Flanagan alleged malice as the basis for an award of exemplary damages. Malice is defined as "specific intent by the defendant to cause substantial injury or harm to the claimant." *Id.* § 41.001(7)

16

(West 2008). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2). When reviewing the legal sufficiency of the evidence to support a finding required under the "clear and convincing" standard, courts must consider all the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 220 (Tex. 2005).

The evidence in this case would allow a rational fact-finder to form a firm belief or conviction that Del Monte specifically intended to cause Flanagan substantial injury or harm. "When a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such." *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 411 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (quoting *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App.—Dallas 2007, no pet.)). "[P]articipation in a breach of fiduciary duty can be the basis of an award of exemplary damages where the jury finds the defendant acted with fraud or malice." *Fid. Nat'l Title Ins. Co. v. Heart of Tex. Title Co.*, No. 03-98-00473-CV, 2000 WL 13037, at *8 (Tex. App.—Austin Jan. 6, 2000, pet. denied) (not designated for publication). Here, Wiley, Del Monte's Galveston port manager, knew that Bradford was providing

17

information about Flanagan's operation to Pacific to allow Pacific to match Flanagan's bid. Indeed, Wiley encouraged Bradford to do so. Bradford unequivocally testified that Wiley knew what Bradford was doing and that it was Wiley who instructed Bradford to gather the information without creating suspicion. Bradford also testified that a Del Monte employee, probably Wiley, provided him a copy of Flanagan's contract and rate sheet to forward to Pacific. This was significant because one reason that Flanagan continued to be chosen by Del Monte is that no other stevedore could match Flanagan's bid. Albano testified that Del Monte should not provide a company's rate sheet to another company because it contains confidential information. However, Albano also testified that he, on behalf of Del Monte, had approved and ratified everything Wiley had done in connection with bringing Pacific into Galveston.

Wiley admitted he was complicit in the scheme. Wiley testified that when he received Pacific's bid in February 2008 he was "very surprised and shocked" that the rates were identical to Flanagan's. And Bradford testified that he and Wiley altered the proposed rate sheet, making "cuts here, increases there." A reasonable inference from these facts is that Wiley made the adjustments to keep total costs on Pacific's bid the same as Flanagan's, while making the scheme less obvious. After receiving Pacific's bid based on Flanagan's confidential information, Del Monte did not follow its normal procedure of soliciting

18

competitive bids. Rather, Wiley informally contacted two other stevedores—his former employer and his roommate's employer—to solicit bids to make the bidding process appear normal. Finally, in May 2008, Lutty—the Del Monte employee ultimately in charge of making the decision—decided to award the contract to Pacific, but told Albano to not tell Flanagan, and Albano falsely informed Flanagan that the contract renewal was still under review.

From this evidence, a rational fact-finder could determine that Del Monte conspired with Bradford to misappropriate Flanagan's business information with the specific intent to keep for itself the benefit of Flanagan's low rate structure—one no other company had ever matched—and the benefit of the experience of Flanagan's manager, Bradford, but also to oust Flanagan as Del Monte's stevedore in Galveston. Accordingly, we hold that the evidence is sufficient to support the trial court's finding that Del Monte acted with malice. *See Fid. Nat'l Title Ins. Co.*, 2000 WL 13037, at *6 (holding some evidence supported implied finding of fraud to support exemplary damages where defendant conspired with plaintiff's employee for employee to breach her fiduciary duties by recruiting co-workers to staff competing office defendant planned to open); *see also Qwest Int'l Commc'ns, Inc. v. AT & T Corp.,* 167 S.W.3d 324, 326 (Tex. 2005) (stating that corporation is liable for exemplary damages if it authorizes or ratifies an agent's malice); *Bright v. Addison*, 171 S.W.3d 588, 598 (Tex. App.—Dallas 2005, pet. denied) (evidence

19

sufficient to support finding of malice in breach of fiduciary duty case where fiduciary (an attorney) failed to disclose business opportunity to his clients and instead usurped it for himself).

In its motion for rehearing, Del Monte also argues that it presented "uncontradicted" evidence that it acted without malice. Specifically, Del Monte argues there can be no malice finding when Wiley and Albano each testified they had no intent to injure Flanagan, and Flanagan offered no direct evidence of malice. But it is well-established that a plaintiff required to prove the state of mind of a defendant need not adduce direct evidence; it may instead rely upon circumstantial evidence. *See Bentley v. Bunton*, 94 S.W.3d 561, 596 (Tex. 2002) (discussing "malice" in a defamation case: "The defendant's state of mind can— indeed, must usually—be proved by circumstantial evidence."); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22–23 (Tex. 1994) (discussing evidence of gross negligence as predicate for exemplary damages and stating, "We hereby reaffirm our holding that the defendant's subjective mental state can be proven by direct or circumstantial evidence."); *Behee v. Mo. Pac. Ry. Co.*, 71 Tex. 424, 429 (1888) ("Malice is rarely ever shown by direct evidence. It is commonly a state of mind indicated and inferable from other facts proved,—from language used, or acts, or both together. We infer a bad motive when an injurious act is intentionally done without legal excuse. The motive is not a bare fact of itself, susceptible of proof

20

like any other fact; it is a conclusion deduced from acts or words."); *Turner v. Franklin*, 325 S.W.3d 771, 783 (Tex. App.—Dallas 2010, pet. denied) (noting issues of state of mind "are not susceptible to being readily controverted and are best left to the determination of the trier of fact"); *French v. French*, 385 S.W.3d 61, 69 (Tex. App.—Waco 2012, pet. denied) (citing *Digby v. Texas Bank*, 943 S.W.2d 914, 922 (Tex. App.—El Paso 1997, writ denied) ("[Malice] is proved by direct or (usually) circumstantial evidence."). The trial court stated that both Wiley and Albano lacked credibility; this determination is left to the trial court as the fact-finder. *See Volume Millwork, Inc.*, 218 S.W.3d at 730. Combining the trial court's determination that Wiley and Albano lacked credibility with the circumstantial evidence detailed throughout this opinion, we conclude the record contradicts Wiley's and Albano's self-serving denials of ill intent. Viewing the evidence in favor of the trial court's findings and indulging reasonable inferences from the evidence, we conclude the record supports the trial court's determination that Del Monte acted with malice.

## Conclusion

We conclude the trial court erred in applying the economic loss rule. We also conclude the trial court erred in applying the settlement credit to the award of exemplary damages. We reverse the judgment of the trial court and render judgment for Flanagan in the amount of $635,928.

Rebeca Huddle
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.