

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

## No. 08-25-00073-CV

---

### In Re Guardianship of Jelitthza Lopez-Reta

---

On Appeal from the Probate Court No 2
El Paso County, Texas
Trial Court No. 2023-CGD00082

---

## MEMORANDUM OPINION

Appellant Angel Lopez appeals the probate court's order designating Appellee Lorena Lopez as guardian of the person over their daughter, Jelitthza Lopez-Reta. Angel asserts two issues on appeal. First, he argues that the probate court erred in finding that Jelitthza is totally incapacitated under § 1101.101 of the Texas Estates Code; *See* Tex. Est. Code Ann. § 1101.101(a)(2)(D)(i). Second, he contends that there was insufficient evidence to support the probate court's finding that it considered alternatives, including available supports and services, that would eliminate the need for guardianship, and that such alternatives were infeasible. *See id*. §1101.101(a)(1)(D)-(E). We affirm.

# I. BACKGROUND

In May 2023, Lorena filed her "Application for the Appointment of Permanent Guardian of the Person Only" seeking to be named guardian of her 21-year-old daughter Jelitthza. In her application, Lorena alleged that Jelitthza is an incapacitated person who was previously diagnosed with an intellectual disability, as defined by § 1002.017 of the Texas Estates Code. *See id*. § 1002.017. She requested that the probate court remove the following rights from her daughter: (1) to make any gifts of real or personal property; (2) to drive and obtain a driver's license; (3) to execute a living will; (4) to execute a power of attorney; (5) to execute any and all legal documents or contracts; (6) to execute a last will and testament; (7) to marry; and (8) to determine and make decisions regarding residence. She also asserted that alternatives to guardianship as well as available supports and services were considered and that no feasible alternatives or supports would eliminate the need for a guardianship.

In October 2024, the day before the hearing on the application, Angel filed his answer, general denial, and objection to the application. *See id*. § 1055.001(a)(2) ("any person" has the right to "appear and contest a guardianship proceeding or the appointment of a particular person as a guardian"). The probate court held a hearing, heard testimony and considered evidence as well as argument of counsel.

# II. EVIDENCE BEFORE THE PROBATE COURT

Angel, Lorena and Raquel Lauretano, the court appointed investigator, testified at the hearing.[1] Lauretano provided findings of her investigation of Jelitthza. Also admitted into evidence were two medical evaluations of Jelitthza from her physician and a psychiatrist.

---

[1] Lorena and Angel's divorce was finalized two months prior to the hearing.

### A. Lorena's testimony

Lorena testified that Jelitthza has intellectual disabilities. Jelitthza can prepare simple meals on her own but cannot use a stove unsupervised. She can shower, use the toilet, and dress herself, and can also perform various housekeeping duties such as laundry and cleaning her room. She was enrolled in special education classes and graduated from high school but is no longer enrolled in any school.[2] Jelitthza owns a cell phone and can use it to dial 911. Lorena testified that Jelitthza is not currently on any type of medication, although she asks her mother's opinion when she needs to take medicine. When asked if she had tried any other alternatives to guardianship, she said she had not. Lorena was asked if she had ever explored the possibility "of making an agreement with Jelitthza that" would enable her to make decisions on Jelitthza's behalf. She said she was unsure how much of that discussion Jelitthza really understood. When asked if Jelitthza can function "safely in society" Lorena responded, "she does function."

With the exception of an 11-month period during which she lived with Angel, Jelitthza has always lived with Lorena and Lorena does not believe that she can live alone.[3] According to Lorena, Jelitthza would not be able to pay her rent timely and while Jelitthza knows that things have to be paid for generally, she does not know "the amounts or when they need to be paid."

---

[2] Lorena stated that Jelitthza was first enrolled in special education classes beginning in kindergarten or first grade.

[3] The court investigator's report details that this stay with Angel was the impetus for Lorena's petitioned for guardianship in the first place:

> Lorena Lopez decided to petition the court for guardianship of her daughter . . . due to conflicts with her estranged husband. She reports that in or about June 2022, her husband took their three children for a visit and refused to return their two daughters to her care (reportedly only returning their son). The proposed ward initially expressed a desire to remain with her father; however, he reportedly refused to allow contact between the proposed ward and her mother for the following 11 months. The proposed ward then contacted her mother on Mother's Day . . . asking for her to pick her up so that they could have a meal together. Ms. Lopez did not return her daughter to Mr. Lopez after that date, as the proposed ward expressed that she no longer wished to live with her dad, as he was too restrictive. However, the proposed ward has reportedly maintained contact with her father since May.

Lorena also does not believe that Jelitthza (if she were living alone) would be able to go to the grocery store and buy food. Jelitthza must be reminded to take baths. Lorena stated that Jelitthza is unable to make complex decisions involving her finances[4] and contracts.

## B. Angel's testimony

Angel testified that he "saw [Jelitthza] as a normal child." He stated that the two of them were very close. He testified that Jelitthza was able to use the phone, identify family members without any issues, and remember things. Angel said that the two of them discuss the television programming that she watches. He stated that Jelitthza wants a boyfriend, job, friends, marriage, and children of her own. In his opinion, with education, he believes Jelitthza could drive a car. It was his overall belief that Jelitthza is capable of "functioning independently and safely in society" and that she can go to work every day, catch a bus, understand her pay, and attend to all her needs as an independent adult.

## C. Lauretano's testimony

### (1) The report

Lauretano, the senior court investigator for the probate court, provided a narrative on the report she produced after investigating Jelitthza's circumstances. *See* Tex. Est. Code Ann. § 1054.151 ("On the filing of an application for guardianship . . . a court investigator shall investigate the circumstances alleged in the application to determine whether a less restrictive alternative to guardianship is appropriate."); *id*. § 1054.153 (detailing that the court investigator shall file a report containing the investigator's findings and conclusion).[5]

---

[4] Lorena indicated that Jelitthza cannot perform even simple financial transactions. She testified that Jelitthza knows what a $20 bill is but is unable to calculate the appropriate amount of change in a transaction.

[5] While the investigator's report itself was never admitted into evidence, we presume that the probate court reviewed it. *See Guardianship of N.P.*, No. 02-19-00233-CV, 2020 WL 7252322, at *8 (Tex. App—Fort Worth Dec. 10, 2020, pet. denied) (mem. op.) (ruling that because the Estates Code "mandates such a filing" the court of appeals presumed

She found that Jelitthza is capable of independently performing her daily activities—such as bathing, dressing, grooming, using the toilet, and eating. She can be home without supervision, but she does not leave the home by herself. Jelitthza requires assistance with transportation, scheduling appointments, and needs assistance with medication management. She previously had a job bussing tables at a restaurant for about three months; at the time of the investigation, she was not employed.[6]

Jelitthza expressed a desire to enroll in community college, but she performed at a 3rd-grade level in reading, writing, and math. Lauretano provided Jelitthza with a simple explanation of guardianship and she "appeared able to understand a simple explanation, after which she agreed to the appointment of her mother as her guardian to assist her with everyday decisions." Lauretano found that Jelitthza has "good family support from her mother and siblings." In her report, Lauretano provided that:

> Pursuant to Sec. 1002.031, Texas Estates Code, there is a requirement to identify and use less-restrictive alternatives to guardianship, if available and appropriate, in an effort to promote and protect the well-being of the person. Less restrictive alternatives to guardianship have been identified. The proposed ward . . . would benefit from a Supported-Decision Making Agreement[7] [SDMA] wherein she can identify someone to assist her with decision-making. The proposed ward can also assign an authorized representative through Health and Human Services to assist

---

that the probate court considered the report, thus allowing the court of appeals to take the report into account in its own analysis) (citing *In re Guardianship of Parker*, 275 S.W.3d 623, 629 (Tex. App.—Amarillo 2008, no pet.)).

[6] It was not clear why Jelitthza was no longer working. Lorena testified that while Jelitthza can work, she does not want to and is scared to work.

[7] An SDMA is an agreement by an adult with a disability which authorizes the supporter to do any or all of the following: (1) providing assistance in understanding "the options, responsibilities, and consequences of the adult's life decisions, without making those decisions on behalf of the adult with a disability"; (2) assisting the adult in "accessing, collecting, and obtaining information that is relevant to a given life decision"; (3) assisting the adult with a disability in understanding information that is relevant to a life decision; and (4) assisting the adult with communicating with adults about their decisions. Tex. Est. Code. Ann. § 1357.051(1)–(4); *see id*. § 1357.003 ("The purpose of this chapter [referring to SDMA] is to recognize a less restrictive alternative to guardianship for adults with disabilities who need assistance with decisions regarding daily living but who are not considered incapacitated persons for purposes of establishing a guardianship under this title") (internal footnote omitted).

with her Medicaid Application, and her mother can apply to be named her representative payee through the Social Security Administration.

Finally, she concluded that, should the probate court decide that guardianship is necessary, Lorena was qualified to serve as the permanent guardian.

Lauretano restated her report finding that Jelitthza can attend to her activities of daily living such as grooming, bathing, dressing, using the toilet, and household chores. She also believes that while Jelitthza can grow and mature, Jelitthza is not capable of living independently. Lauretano also voiced her opinion that Jelitthza may not be totally incapacitated, but perhaps only partially incapacitated. Lauretano further believed that Jelitthza would be "very vulnerable" and gave the example of Jelitthza's inability to go to a nightclub by herself; she further expressed doubts about Jelitthza's ability to obtain a driver's license. Lauretano reiterated that recommendation of an SDMA.

### D. Andres Aristizabal, M.D. report

Aristizabal was the first physician to evaluate Jelitthza.[8] He diagnosed her with a moderate learning disability. His report indicated she had deficits with immediate recall, solving problems, interpreting idiomatic expressions, and breaking down complex tasks into simple steps and carrying them out. He also found Jelitthza could not (1) initiate and make responsible decisions regarding complex business, managerial, and financial decisions; (2) manage a personal bank account; (3) safely operate a motor vehicle; (4) vote in a public election; (5) make decisions regarding marriage; and (6) determine her own residence. Aristizabal found that Jelitthza could (1) attend to basic activities of daily living (e.g., bathing, grooming, dressing, toileting) without supports and services; (2) attend to instrumental activities of daily living (e.g., shopping, cooking, traveling, cleaning); (3) consent to medical and dental treatment; (4) and consent to psychological

---

[8] Presumably, he is her regular physician since the record indicates Jelitthza was under his continuing treatment.

6

and psychiatric treatment. Aristizabal found that Jelitthza is incapacitated as defined under § 1002.017 of the Estates Code. Further, he found that she is partially incapacitated—that she lacks the capacity to do some, but not all, of the tasks necessary to care for herself and to manage her property.

### E. Martin Guerrero Jr., M.D. report

Guerrero evaluated Jelitthza after the probate court, on its own motion, found that there was good cause to order an independent psychiatric evaluation. Guerrero testified that Jelitthza was referred to him to determine her capacity to: (1) execute a healthcare power of attorney; (2) live independently; (3) manage her finances; (4) drive; (5) vote; (6) marry; (7) travel; (8) make gifts of real/personal property; (9) execute a living will; (10) execute legal documents or contracts; and (11) determine her residence. He concluded the following:

> Based on her developmental intellectual deficiencies, Jelitthza is compromised on all of the above listed functions and lacks capacity in each area. While there were no available psychologic records for review, it is clear from the interview that she is functioning at the mental level of a child based on her vocabulary, spelling, and calculations. She is totally dependent on her mother for all support including transportation, shopping, food, clothing, and housing. Jelitthza's poor understanding of finances places her at high risk of financial exploitation. While she may know the current and past presidents by name, it is unlikely that she comprehends their political and policy positions. Similarly, she may be able to voice immediate preferences (such as living preferences and dietary likes), [but] she is unable to appreciate long-term consequences. She presents dyslexic errors on spelling and visual-spatial deficits on clock drawing. She has poor understanding of her medical needs and cannot schedule her own appointments.

> For these reasons, [] lacks capacity in each of the above functions listed by the court, cannot live independently, and would benefit from having a guardian appointed.

He further reported that Jelitthza could not provide him with any past psychiatric history; she owns a cell phone, but did not know her own number or her mother's number; she can engage in basic activities of daily living on her own including using the restroom, feeding, dressing, grooming, and bathing; but she cannot drive or use public transportation on her own; she can prepare

sandwiches and simple items for herself; and he stated that her mother claims she cannot take medications without supervision nor can she arrange medical appointments by herself.

### F. Probate court's order

The probate court found by clear and convincing evidence that Jelitthza is an incapacitated person under § 1002.017 of the Texas Estates Code ; *See* Tex. Est. Code Ann. § 1002.017.[9] It also found by clear and convincing evidence that alternatives to guardianship as well as supports and services available to the proposed ward that would avoid the need for guardianship were considered but not feasible. *See id*. § 1101.101(a)(1)(D)–(E) Finally, the probate court found by a preponderance of the evidence that Jelitthza is totally without capacity to care for herself or to manage her property. *See id*. § 1101.101(a)(2)(D)(i); *id*. § 1101.151(a).[10]

## III. ISSUES ON APPEAL

Angel asserts two issues on appeal. First, he contends that "the trial court erred in finding that the [proposed] ward is totally incapacitated." In his second issue, he argues that the probate court erred in granting the guardianship because there was insufficient proof the court considered alternatives and supports and services that would avoid the need for guardianship and that they were not feasible.

---

[9] Even though the probate court did not make formal findings of fact and conclusions of law, the findings detailed in the court's order still possess probative value. *See James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A. Inc.*, 403 S.W.3d 360, 364 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (explaining that findings recited in the court's judgment are given probative value when they do not conflict with separately filed findings of fact); *Matter of Guardianship of M.A.L.*, No. 05-24-00205-CV, 2025 WL 1031928, at *4 (Tex. App.—Dallas Apr. 7, 2025, no pet.) (mem. op.) ("But when the trial court includes findings of fact in its judgment and does not issue any separate findings of fact and conclusions of law, the findings in the judgment have probative value.").

[10] The probate court specifically removed the following rights from Jelitthza: (1) to vote in a public election; (2) to obtain a license to operate a motor vehicle; (3) to travel; (4) to make gifts of real or personal property; (5) to execute a directive to physicians/living will; (6) to execute a power of attorney; (7) to execute a last will and testament; (8) to execute any and all legal documents, including but not limited to powers of attorney or contracts; (9) to make personal decisions regarding residence; and (10) to execute a supported decision-making agreement.

## IV. GOVERNING LAW

A court may appoint a guardian with "either full or limited authority over an incapacitated person as indicated by the incapacitated person's actual mental . . . limitations and only as necessary to promote and protect the well-being of the incapacitated person." Tex. Est. Code. Ann. § 1001.001(a). Before appointing a guardian,

> the court must , , , find by clear and convincing evidence that: (A) the proposed ward is an incapacitated person; (B) it is in the proposed ward's best interest to have the court appoint a person as the proposed ward's guardian; (C) the proposed ward's rights or property will be protected by the appointment of a guardian; (D) alternatives to guardianship that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible; and (E) supports and services available to the proposed ward that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible . . . .

*Id*. § 1101.101(a)(1)(A)–(E). The factfinder must also find by a preponderance of the evidence that, among other things,[11] the proposed ward is either (1) "totally without capacity as provided by this title to care for himself or herself and to manage his or her property"; or (2) "lacks the capacity to do some, but not all, of the tasks necessary to care for himself or herself or to manage his or her property."[12] *Id*. § 1101.101(a)(2)(D)(i)–(ii).[13]

---

[11] Though not at issue in this case, the court must also find by preponderance of the evidence (1) that the court has venue of the case; (2) the person to be appointed the guardian is eligible to be the guardian; and (3) if the guardian is appointed for a minor, the guardianship is not created for the primary purpose of enabling the minor to establish residency for school enrollment. Tex. Est. Code. Ann. § 1101.101(a)(2)(A)–(C).

[12] A finding that a proposed ward lacks the capacity to do some things "must specifically state whether the proposed ward lacks the capacity, or lacks sufficient capacity with supports and services, to make personal decisions regarding residence, voting, operating a motor vehicle, and marriage." *Id*. § 1101.101(c).

[13] Whether the probate court finds the proposed ward is totally incapacitated or partially incapacitated dictates whether the court can designate a full guardianship or only a limited guardianship. *See id*. § 1101.151(a) ("If it is found that the proposed ward is totally without capacity to care for himself . . . the court may appoint a guardian of the proposed ward . . . with full authority over the incapacitated person."); *id*. § 1101.152(a) ("If it is found that the proposed ward lacks the capacity to do some, but not all, of the tasks necessary to care for himself . . . the court may appoint a guardian with limited powers . . . .").

An "incapacitated person" is defined by the Estates Code as an adult who because of a mental condition is "substantially unable to" (1) "provide food, clothing, or shelter for himself or herself"; (2) "care for their physical health"; or (3) "manage the person's own financial affairs." *Id.* § 1002.017(2)(A)–(C).

The Estates Code defines "alternatives to guardianship" as: (1) execution of a medical power of attorney under Chapter 166 of the Health and Safety Code; (2) appointment of an attorney in fact or agent under a durable power of attorney; (3) execution of a declaration for mental health treatment under Chapter 137, Civil Practices and Remedies Code; (4) appointment of a representative payee to manage public health benefits; (5) establishment of a joint bank account; (6) creation of a management trust under Chapter 1301; (7) creation of a special needs trust; (8) designation of a guardian before the need arises under Subchapter E, Chapter 1104; and (9) establishment of alternate forms of decision-making based on person-centered planning. *Id*. § 1002.0015(1)–(9). "Supports and services" refers to:

> available formal and informal resources and assistance that enable an individual to: (1) meet the individual's needs for food, clothing, or shelter; (2) care for the individual's physical or mental health; (3) manage the individual's financial affairs; or (4) make personal decisions regarding residence, voting, operating a motor vehicle, and marriage. *Id*. § 1002.031(1)–(4).

## V. STANDARD OF REVIEW

We review a probate court's order imposing a guardianship for an abuse of discretion. *Mandell v. Breland*, 717 S.W.3d 474, 485–86 (Tex. App.—Houston [14th Dist.] 2025, no pet.); *Guardianship of A.E.*, 552 S.W.3d 873, 876 (Tex. App.—Fort Worth 2018, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004); *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). A trial court also abuses its discretion by ruling without

supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But there is no abuse of discretion if the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

The Texas Supreme Court has noted that in "guardianship proceedings especially, the heavy responsibility for determining the best resolution of fundamental and emotional issues lies necessarily within the trial court's sound discretion." *In re Thetford*, 574 S.W.3d 362, 380 (Tex. 2019) (noting that a court's review of a guardianship proceeding must be "singularly mindful of the trial court's unique opportunity and responsibility to assess the circumstances presented"). The probate court has wide discretion in the selection of a guardian. *In re Guardianship of Jackson*, No. 12-13-00222-CV, 2014 WL 3845794, at *1 (Tex. App.—Tyler Aug. 6, 2014, no pet.) (memo. op.) (citing *Thedford v. White*, 37 S.W.3d 494, 496 (Tex. App.—Tyler 2000, no pet.)).

In the review of guardianship orders, legal and factual sufficiency are not independent, reversible grounds of error but are factors to consider in assessing whether the trial court abused its discretion. *Guardianship of A.E.*, 552 S.W.3d at 877; *Mandell*, 717 S.W.3d at 486.

In this case, Lorena, as the applicant for guardianship, had the burden of proof. *See Ulrickson v. Hawkins*, 696 S.W.2d 704, 705 (Tex. App.—Fort Worth 1985, writ ref'd n.r.e.) (op. on reh'g); *In re Guardianship of Winn*, 372 S.W.3d 291, 300 (Tex. App.—Dallas 2012, no pet.); 3 Brandy Baxter-Thompson et al., *Texas Practice Guide: Probate* §17:86 (2025) ("The burden of proof in a guardianship proceeding is on the person alleging the incapacity."). When a party attacks the legal sufficiency of an adverse finding on an issue for which the other party had the burden to prove by a preponderance of the evidence, it must demonstrate on appeal that no evidence exists

to support the adverse finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). In a legal sufficiency review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). "Anything more than a scintilla of evidence is legally sufficient to support the fact finder's finding." *Sanders Oil & Gas, Ltd. v. Big Lake Kay Constr., Inc.*, 554 S.W.3d 79, 83 (Tex. App.—El Paso 2018, no pet.).

The operative test for legal sufficiency asks whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *E. Tex. Educ. Ins. Ass'n v. Ramirez*, 631 S.W.3d 908, 918 (Tex. App.—El Paso 2021, pet. denied); *see also Albert v. Fort Worth & W. R.R. Co.*, 690 S.W.3d 92, 97 (Tex. 2024) (per curiam) ("More than a scintilla of evidence exists to prove a vital fact, making reversal on legal-sufficiency grounds improper, when the evidence rises to a level that would enable reasonable and fair minded people to differ in their conclusions."); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence."). Notably, if the burden of proof below was clear and convincing, the standard of review on appeal is slightly modified: "[W]e view the evidence in the light most favorable to the trial court's decision to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true." *Henges v. Dolliver*, No. 03-20-00429-CV, 2021 WL 5815752, at *5 (Tex. App.—Austin Dec. 8, 2021, no pet.) (mem. op.) (citing *In re Guardianship of Boatsman*, 266 S.W.3d 80, 85–86 (Tex. App.—Fort Worth 2008, no pet.)); *see also City of Keller*, 168 S.W.3d at 817 ("[A] higher burden of proof requires a higher standard of review.").[14]

---

[14] Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Civ. Prac. & Rem Code Ann.

"When reviewing a trial court's decision for factual sufficiency, [we] determine whether the evidence supporting the judgment is so weak as to render the judgment clearly wrong or manifestly unjust." *Fibela v. Wood*, 697 S.W.3d 314, 319 (Tex. App.—El Paso 2023, no pet.) (citing *Ramirez*, 631 S.W.3d at 918). Factual sufficiency challenges require courts of appeals to weigh all the evidence. *See Eggemeyer v. Hughes*, 621 S.W.3d 883, 890 (Tex. App.—El Paso 2021, no pet.) (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996)). We defer to the trier of fact with respect to judgments about the credibility of the witnesses and the weight of the evidence and we do not substitute our judgment for the trier of fact's judgment, even if we might reach a different conclusion upon our review of the record. *Id*. And as for legal sufficiency, the factual sufficiency review must be slightly modified if the burden of proof below was elevated: "[W]e must consider all the evidence in the record—both in support of and contrary to the trial court's findings—to determine whether a factfinder could reasonably form a firm belief or conviction about the truth of the finding." *Henges*, 2021 WL 5815752, at *5 (citing *Boatsman*, 266 S.W.3d at 86). "If the disputed evidence is so significant that a factfinder could not have formed a firm belief or conviction in the truth of the trial court's findings, then the evidence is factually insufficient." *Id*.

## VI. TOTAL INCAPACITY

In his first issue on appeal, Angel argues that the probate court erred when it ruled that Jelitthza was "totally without capacity" to care for herself or to manage her property. No court has definitively ruled on what it means for a proposed ward to be "totally without capacity." Tex. Est. Code Ann. § 1101.101(a)(2)(D)(i). The trial court had to make an initial finding by clear and

---

§ 41.001(2); Tex. Fam. Code Ann. § 101.007; *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994). This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). "While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed." *Boatsman*, 266 S.W.3d at 86 (citing *Addington*, 588 S.W.2d at 570).

convincing evidence that the proposed ward was simply incapacitated. *Id*. § 1101.101(a)(1)(A). A finding of total or partial incapacitation is properly understood as a finding on the severity of that incapacitation.[15] *See id*. §§ 1101.101(a)(2)(D)(i)–(ii), 1002.017(A)–(C); *Guardianship of A.E.*, 552 S.W.3d at 882 (discussing the statute defining "incapacitated person" while addressing the broader question as to whether the trial court abused its discretion by failing to find that the proposed ward was totally incapacitated); *see also Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 727 (Tex. 2024) ("[W]e generally presume the Legislature uses the same word consistently throughout a statute and uses different words to convey different meanings."); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning."); *cf. GEO Group, Inc. v. Hegar*, 709 S.W.3d 585, 594 (Tex. 2025) (noting that "[w]e do not consider statutory words and phrases in isolation. Rather, we consider the context and framework of the entire statute.") (internal citations and quotations omitted). The operative question is to what extent Jelitthza is "substantially unable to": (A) provide food, clothing, or shelter for herself; (B) care for her physical health; or (C) manage her own financial affairs. Tex. Est. Code. Ann. § 1002.017(2)(A)–(C).

---

[15] This understanding is further supported when one considers the statutorily required Certificate of Medical Examinations submitted by Aristizabal and Guerrero. *See Guardianship of N.P.*, 2020 WL 7252322, at *2 (discussing the "statutorily required Physician's CME" that was submitted by the proposed ward's long-time physician) (citing Tex. Est. Code Ann. § 1101.103). The CME asks the physician to assess if the proposed ward is incapacitated for purposes of § 1002.017. The physician is further instructed to indicate the level of incapacity. Both doctors used the prescribed CME form posted on the website of the El Paso County Probate Court No. 2. *See* https://www.epcounty.com/courts/documents/probate/forms/Physicians_Certificate_of_Medical_Examination_9.1.2 3.pdf (last visited Dec. 18, 2025).

This sliding-scale of incapacity is also supported by the provisions that govern whether an appointed guardian is given full or limited authority. Tex. Est. Code Ann. § 1101.151(a). If the court finds that the proposed ward "lacks the capacity to do some, but not all, of the tasks necessary to care for himself or herself . . . the court may appoint a guardian with limited powers . . . [while still allowing] the proposed ward to care for himself or herself, including making decisions regarding residence . . . ." *Id*. § 1101.152(a) (emphasis added). Understandably, the level of a proposed ward's inability to take care of herself has a direct correlation to what kind of guardianship is suitable for them.

Lorena, Guerrero, and Lauretano all opined that Jelitthza lacks the ability to live independently. She can make simple meals for herself, but her mother testified that Jelitthza (if she were living alone) would not be able to go to the store and buy groceries. All three agreed that Jelitthza is unable to deal with complex transactions involving her finances and contracts. She can attend to some of the activities of daily living, but Guerrero found, she is totally dependent on her mother "for all support including transportation, shopping, food, clothing, and housing." Guerrero also found that her poor understanding of finances "places her at high risk of financial exploitation." Finally, Jelitthza also demonstrated a poor understanding of her medical needs, so would be unable to attend to her physical needs.

Despite Jelitthza's ability to attend to some of the activities of daily living—such as grooming, bathing, and using the restroom—there is more than a scintilla of evidence that she was unable to perform the items listed in § 1002.017 that defines "incapacitated person." *See Guardianship of N.P.*, 2020 WL 7252322, at *2 (proposed ward could perform certain basic tasks, but court of appeals held that she was still totally incapacitated); *Guardianship of A.E.*, 552 S.W.3d at 882–83 (focusing on evidence that evinced a total inability to meaningfully take care of oneself and engage in higher-level thinking that suggested total incapacitation); *cf. Jackson*, 2014 WL 3845794, at *4 (ruling that even though the proposed word could take care of his own personal hygiene, this did not override the other evidence of incapacitation).

Here, the evidence was legally sufficient to support the probate court's finding that Jelitthza was totally incapacitated. *See City of Keller*, 554 S.W.3d at 83; *Sanders Oil & Gas*, 554 S.W.3d at 83; *Kindred*, 650 S.W.2d at 63. With respect to factual sufficiency, we acknowledge that the record contains evidence that Jelitthza was only partially incapacitated. Aristizabal found that Jelitthza was only partially incapacitated—a conclusion also shared by Lauretano. In addition, Angel's

testimony suggested that Jelitthza suffers from no serious impediments at all. However, there is ample evidence that she lacked the ability to perform the items listed in the definitional statute. *See Eggemeyer*, 621 S.W.3d at 890. Despite the conflicting evidence about the extent of Jelitthza's deficits, it is within the trial court's province to weigh the evidence and the credibility of the witnesses. *See id*. On this record, we cannot find that the evidence is "so weak as to render the judgment clearly wrong or manifestly unjust." *Fibela*, 697 S.W.3d at 319.

We hold that the trial court did not abuse its discretion in finding Jelitthza is totally incapacitated. *See Unifund CCR Partners*, 299 S.W.3d at 97 ("The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision."). We overrule Angel's first issue.

## VII. ALTERNATIVES TO GUARDIANSHIP

In his second issue, Angel contends that there was legally and factually insufficient evidence that the court considered alternatives to guardianship and supports and services but that they were not feasible.

### A. Alternatives to guardianship and supports and services

The probate court must find that no alternatives or supports and services are feasible by *clear and convincing evidence*. Tex. Est. Code Ann. § 1101.101(a)(1)(D)–(E). Alternatives to guardianship include: (1) execution of a medical power of attorney under Chapter 166 of the Health and Safety Code; (2) appointment of an attorney in fact or agent under a durable power of attorney; (3) execution of a declaration for mental health treatment under Chapter 137, Civil Practices and Remedies Code; (4) appointment of a representative payee to manage public health benefits; (5) establishment of a joint bank account; (6) creation of a management trust under Chapter 1301; (7)

16

creation of a special needs trust; (8) designation of a guardian before the need arises under Subchapter E, Chapter 1104; and (9) establishment of alternate forms of decision-making based on person-centered planning. Tex. Est. Code. Ann. § 1002.0015(1)–(9). "Supports and services" refers to "available formal and informal resources and assistance that enable an individual to: (1) meet the individual's needs for food, clothing, or shelter; (2) care for the individual's physical or mental health; (3) manage the individual's financial affairs; or (4) make personal decisions regarding residence, voting, operating a motor vehicle, and marriage." *Id*. § 1002.031(1)–(4).

Because Lorena only sought guardianship over Jelitthza's person, and not her estate, the alternatives pertaining to finances are not relevant. *See Guardianship of A.E.*, 552 S.W.3d at 886. Angel did not identify which of the remaining statutory alternatives would be suitable for Jelitthza. While there was extensive discussion among the judge, Lauretano, and counsel about alternatives to guardianship, the only recommendation was Lauretano's that an SDMA could work and would be "beneficial to explore." [16] The judge stated interest and support for further exploring the possibilities of alternatives. In fact, the judge stated a third psychiatric evaluation to further consider alternatives would assist the court.

However, the SDMA suggested by Lauretano is not feasible when the ward does not have the capacity to make decisions. *Guardianship of A.E.*, 552 S.W.3d at 889. Given Jelitthza's total incapacity, the probate court did not abuse its discretion in finding that the SDMA was not feasible. *See id.*; *Unifund CCR Partners*, 299 S.W.3d at 97 ("The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision.").

Although other alternatives were not mentioned or requested, they were not feasible either because, like an SDMA, they would require Jelitthza to have the capacity to consent or understand

---

[16] Lauretano noted that she is under a statutory obligation to consider alternatives as part of her examination and report. *See* Tex. Est. Code Ann. § 1054.151.

consequences. *See Mandell*, 717 S.W.3d at 493 (ruling that the severity of the proposed ward's cognitive limitations did not render any of the alternatives feasible); *Guardianship of A.E.*, 552 S.W.3d at 887–89 (explaining that if the proposed ward is totally incapacitated, none of the relevant alternatives are suitable because of her inability to execute the required documents or understand their consequences). The evidence was both legally and factually sufficient for the probate court to form a firm belief or conviction that alternatives to guardianship were not feasible.

## B. Supports and services

The feasibility of supports and services depends on whether they would allow Jelitthza to provide for her own needs. In the words of one our sister courts:

> All the evidence at the hearing established that no amount of resources would enable A.E. to meet her own needs for food, clothing, or shelter; care for her physical or mental health; manager her financial affairs; or make personal decisions regarding residence, voting, operating a motor vehicle, and marriage.
>
> .          .          .
>
> The clear and convincing evidence at the hearing established as a matter of law that resources would not enable A.E. to meet her needs, care for her health, manage her finances, or make the personal decisions prioritized by the Estates Code. Her needs and health must be managed *for her* because she cannot understand her options to make those decisions for herself, even when they are explained to her.

*Guardianship of A.E.*, 552 S.W.3d at 884 (emphasis in original). There was no evidence presented that Jelitthza would be able to take care of herself with the help of others. Again, what was true for A.E. with respect to supports and services is also true of Jelitthza given her serious cognitive deficits. *See id*. We conclude that the evidence was legally and factually sufficient for the probate court to form a firm belief or conviction that that supports and services were not a viable alternative to guardianship. We overrule Angel's second issue.

## VIII. CONCLUSION

We hold the probate court did not abuse its discretion in finding that Jelitthza was totally incapacitated and that alternatives to guardianship or supports and services were not feasible. We affirm the court's order appointing Lorena as permanent guardian.

MARIA SALAS MENDOZA, Chief Justice

January 14, 2026

Before Salas Mendoza, C.J., Palafox and Soto, JJ.
Soto, J., concurring without opinion